**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS GALLAGHER, Individually and on behalf of all others similarly situated, | Case No. 17-cv-5011 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| OCULAR THERAPEUTIX, INC., AMARPREET SAWHNEY, GEORGE MIGAUSKY, ANDREW HURLEY, and ERIC ANKERUD, | |
| Defendants. | |

Plaintiff Thomas Gallagher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ocular Therapeutix, Inc. ("Ocular Therapeutix" or the "Company"), analysts' reports and advisories about the Company,

and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Ocular Therapeutix from May 5, 2017 through July 6, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business and a significant portion of Defendants' actions and subsequent damages took place within within this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying Certification, purchased Ocular Therapeutix securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Ocular Therapeutix focuses on the development and commercialization of therapies for diseases and conditions of the eye using its proprietary hydrogel platform technology in the United States. The Company is incorporated in Delaware and its principal executive offices are located at 34 Crosby Drive, Suite 105 Bedford, Massachusetts. The Company is registered to do business in New Jersey. Ocular Therapeutix's securities are traded on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "OCUL."

8.      Defendant Amarpreet "Amar" Sawhney ("Sawhney") has been the Company's Chief Executive Officer throughout the Class Period.

9.      Defendant George Migausky ("Migausky") has been the Company's Chief Financial Officer throughout the Class Period.

10.      Defendant Andrew "Andy" Hurley ("Hurley") has been the Company's Chief Commercial Officer throughout the Class Period.

11.      Defendant Eric Ankerud ("Ankerud") has been the Company's Executive Vice President of Regulatory, Quality, and Compliance throughout the Class Period.

12.      Defendants Sawhney, Migausky, Hurley, and Ankerud are sometimes referred to herein as the "Individual Defendants."

13.      Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.     The Company's lead product is DEXTENZA, which is in Phase III clinical trial for the treatment of post-surgical pain and inflammation, allergic conjunctivitis; and in Phase II clinical trial for the treatment of inflammatory dry eye disease.

18.     Form FDA 483 is a form used by the U.S. Food and Drug Administration ("FDA") to document and communicate concerns discovered during inspection.

### Materially False and Misleading Statements

19.     On May 5, 2017, the Company issued a press release disclosing that is had received a Form 483 related to DEXTENZA, stating in part:

**Ocular Therapeutix™ Reports First Quarter 2017 Financial Results**

*PDUFA Target Action Date of July 19, 2017 for the DEXTENZA™ NDA for the Treatment of Ocular Pain Following Ophthalmic Surgery; Commercial Launch Preparation Activities Underway*

*Enrollment Continues in First Phase 3 Clinical Trial of OTX-TP (travoprost insert) for the Treatment of Glaucoma and Ocular Hypertension*

*Conference Call Today at 8:30 am Eastern Time*

May 05, 2017 07:30 AM Eastern Daylight Time
BEDFORD, Mass.--(BUSINESS WIRE)--Ocular Therap
eutix, Inc. (NASDAQ: OCUL), a biopharmaceutical company focused on the development, manufacturing and commercialization of innovative therapies for diseases and conditions of the eye, today announced financial results for the first quarter ended March 31, 2017.

 "This is an important time for Ocular Therapeutix as we approach the PDUFA target action date for our lead product candidate, DEXTENZA, for the treatment of ocular pain following ophthalmic surgery," said Amar Sawhney, Ph.D., President, Chief Executive Officer and Chairman. "Should DEXTENZA be approved, its commercial launch will enable our transition into a fully-integrated, commercial-stage, revenue-generating company. DEXTENZA has now been extensively studied for the treatment of post-surgical ocular pain and inflammation in over 550 clinical trial participants. If approved, we believe

5

DEXTENZA will address the compliance issues associated with steroid eyedrops and serve as an attractive alternative for both patients and ophthalmologists."

Recent Highlights and Anticipated Near-Term Milestones for Key Development Programs

DEXTENZA™

- A New Drug Application (NDA) for DEXTENZA (dexamethasone insert) 0.4mg for intracanalicular use is currently under review by the U.S. Food and Drug Administration (FDA) for the treatment of ocular pain following ophthalmic surgery. The FDA has set a target action date under the Prescription Drug User Fee Act (PDUFA) of July 19, 2017 for a decision regarding the potential approval of DEXTENZA. ***Following a re-inspection of manufacturing operations by the FDA which was completed earlier this week, Ocular Therapeutix received an FDA Form 483 containing inspectional observations focused on procedures for manufacturing processes and analytical testing, related to manufacture of drug product for commercial production.*** The Company plans to evaluate and respond to the FDA within 15 days with corrective action plans to complete the inspection process. Adequate resolution of the outstanding Form 483 inspectional observations is a prerequisite to the approval of the NDA for DEXTENZA.
    - Subject to the approval of the NDA for post-surgical ocular pain by the FDA, Ocular Therapeutix intends to submit an NDA supplement for DEXTENZA to broaden its label to include an indication for post-surgical ocular inflammation.
- Ocular Therapeutix plans to present additional data from its most recent Phase 3 study evaluating the efficacy and safety of DEXTENZA for the treatment of ocular pain and inflammation following cataract surgery, at the upcoming American Society of Cataract and Refractive Surgery (ASCRS) Annual Meeting, being held today through Tuesday, May 9, in Los Angeles, CA.
    - Additional presentations will be made at the meeting regarding recent positive results of a patient experience study of DEXTENZA as well as the importance of the assessment of ocular pain.
- In addition, DEXTENZA is in Phase 3 clinical development for the treatment of allergic conjunctivitis. In May 2017, the Company initiated a non-significant risk device study to confirm the effect on efficacy of the placebo insert used in previous studies compared with a rapidly resorbing placebo insert.
    - Subject to favorable results from this study, the Company plans to conduct an additional Phase 3 clinical trial to further evaluate DEXTENZA for the treatment of allergic conjunctivitis.

(Emphasis added).

20.      On that same day, the Company held an earnings conference call, during which

Defendant Ankerud stated the following regarding the Form 483:

Eric Ankerud

Good morning, Ken. Thanks for the question. ***FDA completed the re-inspection of our facility as part of the NDA review late yesterday afternoon. As Amar mentioned, 43 was issued.*** We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues. This was a new investigator not the same investigator from prior inspections, and their primary focus in the 43 relates to a particular matter issue as part of our manufacturing process. The issue relates primarily to completion of an investigation that we have underway in regard to the particular matter solidifying specifications for in process, 100% visual inspection of our inserts, as well as enhancing our operator training. ***We feel quite comfortable that we have the situation under control and we are preparing responses to the 43 as of this morning in anticipation of responding within 15 calendar days to the agency.*** In addition to the particular matter issue, FDA raised a couple of observations in regard to analytical method, testing to be completed, as well as some other issue related to quality oversight of batch records. So in summary, we believe that each of the observations raised by FDA during this continuous improvement review of our fully developed manufacturing process are handled well and will be resolved in our response to FDA. We're also pleased that the collaborative nature of our NDA review has continued between the various offices of FDA, and we're marching toward that PDUFA date and ***expect that we can resolve the 43 issues in a timely manner.***

(Emphasis added).

21.      During the earnings conference call, Defendant Sawheny had the following

exchange with an analyst regarding the Form 483:

Andrew Berens

Okay. Is there anything in their observations that you think could delay the action date specifically?

Amar Sawhney

Nothing that we can currently see. I think these -- as you know, probably 90% plus inspections have 483. ***The question is one of the nature of the issues in the***

***483, we think these are resolvable issues, and we have responses.*** Some already prepared and some being prepared to address them in a timely fashion.

(Emphasis added).

22.     The statements referenced in ¶¶ 19 - 21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) Ocular Therapeutix's management has been misleading investors about DEXTENZA manufacturing issues, including that more than 50% of lots manufactured by Ocular Therapeutix contain bad product; (2) such manufacturing issues could imperil the approval of DEXTENZA by the FDA; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

23.     On July 6, 2017, *Seeking Alpha* published an article on the Company concerning DEXTENZA manufacturing issues, stating in pertinent part:

**Ocular: A Poke In The Eye**

Jul. 6, 2017 3:09 PM ET66 comments
by: TripleGate

Summary

* Dextenza unlikely to get approved by the FDA on July 19 PDUFA date.

* Management has been misleading investors about manufacturing.

* OCUL's hydrogel technology is worthless at the moment.

I used to be an investor in Ocular Therapeutix (NASDAQ:OCUL) because the risk/reward was highly attractive and the company had a lot of potential. Unfortunately, management has failed to execute and brought the company to

the brink of collapse. It is not surprising to me that the ENTIRE senior management has resigned recently (CFO, CMO and CEO).

**Dextenza Manufacturing Issues**

OCUL has disclosed that they received a second 483 from the FDA after their facility re-inspection. Even a layperson reading this can tell that the company is having serious manufacturing issues, and their whole approach to manufacturing and patient safety is highly questionable. What's more troubling is that either management doesn't fully understand the letter, or they have been misleading investors. Both are bad.

On their last earnings call. management made a number of statements regarding the 483 and the company's manufacturing process:

> "*We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues.*" Ocular Therapeutix's CEO Amar Sawhney on Q1 2017 Results - Earnings Call Transcript.

> "*So I think that's a strong sign that the manufacturing process has move forward significantly, and is in a fully developed mode.*"

The CEO concluded:

> "*Also remembering that this is a new investigator, different one that came last time. So when you have a different one coming, they confirm what the prior one did, and then they probably have some additional helpful suggestions.*"

Now, let's look at reality:

**First**, OCUL has REPEAT observations. Not only did they not resolve prior issues, but have committed worse transgressions. Here is a copy of the first 483

**Observation 6** reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*"

**Observation 5** of the second 483 reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*" Sounds familiar?

9

**Observation 3** of the second 483 reads: "*There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess. Specifically, your firm lacks documentation to show that your product can consistently meet specifications as you have not systemically evaluated the [redacted] lots manufactured from FEB2016 to present, of which [redacted] failed specification and were disposed of in-process*"

In plain English, this means, OCUL still doesn't know to make their product consistently. How does OCUL deal with instances when product doesn't meet specifications? They have been **discarding bad manufacturing lots** without investigation.

**Second**, OCUL has characterized their manufacturing as "in a fully developed mode." Well, **Observation 1** of the second 483 reads: "Particulate matter has been noted in 10/23 lots (intended use clinical, R&D, stability, etc.) manufactured from FEB2016 to date. The remaining [redacted] lots were scrapped prior to the visual inspection therefore their particulate status remains unknown."

In plain English, this means that more than 50% of lots manufactured by OCUL contain bad product. That leaves plenty of room for additional development. Sometimes, OCUL has had to discard entire lots because they were out of spec!!

**Third**, if OCUL only discarded bad product without investigation, that would be a bad thing. But in fact, they have been using bad product in clinical trials and have released some into their commercial supply!

**Observation 1** continues: "*Particulates were not logged as product defects prior to FEB2016, therefore lots released prior to that date, such as clinical trial lots [redacted], released [redacted]respectively and used in human clinical trials are unknown with respect to particulate statu*s."

**Observation 2** reads: "*The following batches were released without an understanding of the defects present, more specifically, particulate matter of unknown origin and composition at the time of release: ....all three lots were released for intended commercial use on 12JAN2017 without critical defect limits*"

OCUL believes that their manufacturing is "fully developed" and remaining issues can be resolved quickly. The reality is, IF Dextenza is possible to manufacture on a mass scale, something which hasn't been done before, OCUL needs to revamp their entire process from the ground up, which can take years to do. They need to use the proper scientific tools and procedures.

(**Observation 5** of the second 483 says that the scales OCUL has been using aren't sensitive enough to weigh the "full range of materials")

**Fourth**, calling 483 observations "helpful suggestions," reflects a lack of understanding of the FDA compliance function. I have a lot of respect for OCUL's now-former CEO. He is a brilliant person and a highly successful entrepreneur. However, the pharmaceutical world is not his, and he finally recognized that he is not the right person to develop the company further.

(Emphasis in original).

24.     On that same day, *STAT* published an article on the Company asserting that DEXTENZA could be rejected by the FDA because of product contamination, including aluminum, found by an FDA inspector during a visit to the company's manufacturing facility.

25.     On this news, shares of Ocular Therapeutix fell $3.06 per share or over 30% over two trading days to close at $7.12 per share on July 7, 2017, damaging investors.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Ocular Therapeutix during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ocular Therapeutix securities were actively traded

on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of Ocular Therapeutix securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

33.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ocular Therapeutix securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Ocular Therapeutix securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

34.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

35.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

36.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

38.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they

14

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Ocular Therapeutix securities during the Class Period.

40.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

41.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

42.     As a result of the foregoing, the market price of Ocular Therapeutix securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Ocular Therapeutix securities during the Class Period in purchasing Ocular Therapeutix securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

43.     Had Plaintiff and the other members of the Class been aware that the market price of Ocular Therapeutix securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Ocular Therapeutix securities at the artificially inflated prices that they did, or at all.

44.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

45.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Ocular Therapeutix securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

46.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

48.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

49.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ocular Therapeutix securities.

50.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and

17

exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

51.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 7, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff